John L. FAHS, Collector of Internal Revenue for the District of Florida, Appellant,

v.

John W. MARTIN, Trustee in Bankruptcy for Florida East Coast Railway Company, Appellee.

No. 15343.

United States Court of Appeals
Fifth Circuit.

June 30, 1955.

James L. Guilmartin, U. S. Atty., Miami, Fla., Lee A. Jackson, Elizabeth B. Davis, Ellis N. Slack, Special Assts. to Atty. Gen., H. Brian Holland, Asst. Atty. Gen., Edith House, Asst. U. S. Atty., Jacksonville, Fla., for appellant.

Charles T. Akre, Robert N. Miller, Washington, D. C., Russell L. Frink, Harold B. Wahl, Jacksonville, Fla., F. O. Graves, Miller & Chevalier, Washington, D. C., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE, Circuit Judge.

TUTTLE, Circuit Judge.

The former Internal Revenue Collector for the State of Florida here appeals from a judgment of the trial court in favor of the Trustee in Bankruptcy for the Florida East Coast Railway Company for a refund of income and/or excess profits taxes for the years 1943, 1944, 1945 and 1946.

The trial was by the court without a jury on stipulated facts. The questions may be simply stated even if they require something more than simple answers:

1. Where a railroad company, all of whose property was in Florida, executed and delivered in New York a mortgage indenture on such property to secure certain first and refunding coupon bonds which were also executed, delivered and made payable in New York, and where the mortgage indenture expressly provided the proceeds of foreclosure sale should be applied not only to the amounts of principal and interest due, but also to interest on overdue installments of interest, and where the railroad trustees accrued on its books the interest on overdue coupons representing installments of interest, are such trustees entitled under Section 23 of the Internal Revenue Code to deduct in 1947 and 1948 the interest

so accrued for those years on the defaulted interest coupons?

2. Is the taxpayer, when carrying back net operating losses from 1947 to 1945 and from 1948 to 1946, entitled for excess profits tax purposes, to deduct the full amounts of those losses or is it required to reduce them by 50% of the interest on borrowed capital by reason of the provisions of Section 711(a) (2) (L) of the Internal Revenue Code?

Appellee agrees that appellant's statement of the case is correct. We shall, therefore, adopt that statement from appellant's brief.

The suit below was instituted by Scott M. Loftin and John W. Martin as trustees in bankruptcy for the Florida East Coast Railway Company, hereinafter referred to as the taxpayer. During the pendency of the proceeding, Mr. Loftin died and by order of the court John W. Martin, as sole trustee in bankruptcy, was substituted as the sole party plaintiff.

The taxpayer is a railway corporation whose real property is in the State of Florida, and which has no property in other states. On January 25, 1941, a petition for reorganization of the taxpayer under Section 77 of the Bankruptcy Act was filed in the District Court for the Southern District of Florida, stating that the debtor was insolvent and unable to meet its obligations. For about nine years prior to that time the corporation had been operating in receivership proceedings instituted in the District Court. The reorganization proceeding is still pending and the property of the debtor is being operated by the trustee.

The taxpayer has outstanding $45,000,-000 first and refunding mortgage gold bonds dated September 1, 1924, and maturing September 1, 1974. These bonds were issued in New York and payable in New York. The bonds are secured by a mortgage covering all of the property used by the company for railroad purposes. The mortgage was executed in New York and the trustees under the mortgage indenture were a New York bank and an individual, a resident of New York. The mortgage provides for entry by the trustees upon the property after default and that in case the principal sum of the bonds shall not have become due at the time income shall be applied to the payment in default "with interest thereon at the same rates, respectively, as were borne by the respective bonds on which such interest shall be in default." It further provided that any proceeds of sale by the trustees should be applied after expenses of the sale had been paid, etc., to the payment of the amounts of principal and interest due, together with interest on the principal and overdue installments of interest.

On November 10, 1943, the trustees petitioned the District Court for the Southern District of Florida, sitting in bankruptcy, for authority to accrue the interest on interest, the coupons having become in default. This interest on interest is hereinafter referred to as penalty interest. On November 18, 1943, an order was entered by the District Court, the material parts of which are as follows:

"This cause coming on to be heard upon petition of the Trustees for instruction with reference to accrual of interest on the overdue installments of interest on the bonds issued under the Railway Company's First and Refunding Mortgage, some times colloquially referred to as 'penalty interest,' and the Court finding that such penalty interest is a legal obligation of the Railway Company, and no objection to such petition having been made, upon consideration thereof

"It Is Ordered, Adjudged and Decreed that the Trustees are hereby authorized and directed to enter and accrue on their books and deduct from income for tax purposes such interest on the overdue installments of interest on the bonds issued under the Railway Company's First and Refunding Mortgage, for the year 1942 and succeeding years, and the Trustees are authorized and directed to file an amended income tax return and claim for refund of income taxes for the year 1942

all as recommended in their said petition."

For the calendar years 1947 and 1948, the trustees filed income tax returns showing net operating losses in the amount of $3,887,056.10 for 1947 and $2,113,406.53 for 1948. In arriving at these net operating losses there were deducted the sums of $1,620,622.94 for 1947 and $1,697,028.03 for 1948, as interest on matured and unpaid coupon interest, otherwise known as penalty interest. The Commissioner of Internal Revenue determined net operating losses for 1947 and 1948, which were allowed as carrybacks to 1945 and 1946, but disallowed the penalty interest claimed on the returns for 1947 and 1948.

The Commissioner allowed the total amount of the net operating losses for 1948 as a carry-back against the normal tax income for 1946, and allowed the total amount set forth above for 1947 as a carry-back deduction against the normal tax income for 1946. However, he allowed a 1947 net loss carry-back of only $874,206.89 as a deduction against the 1945 excess profits net income, the difference representing 50% of the interest on borrowed capital for 1947 accrued as a liability by the taxpayer. He did not allow any carry-back from 1948 as a deduction against the 1946 excess profits net income as 50% of the borrowed capital exceeded the amount allowed as a deduction against ordinary net income. As a result of these adjustments, the Commissioner determined overpayments which were refunded and not involved in this suit.

The refunds just mentioned were made in 1951. On June 9, 1949, the trustees had filed claims for refund for the years 1943, 1944, 1945 and 1946. The claims for 1945 and 1946 were based on carrybacks of net operating losses of approximately $3,800,000 from 1947 to 1945, and approximately $2,100,000 from 1948 to 1946, upon the ground that the taxpayer was entitled to deduct the interest on interest claimed in its returns for those years. The claims for 1943 and 1944 were based on carry-backs to those years

of unused excess profits credits for 1945 and 1946. These claims for refund, to the extent not allowed, were rejected on May 11, 1951.

On August 13, 1951, the trustees filed with the Collector of Internal Revenue supplemental claims for refund for the years 1943, 1944, 1945 and 1946. These claims were based upon the contention that the Commissioner erred in reducing the net operating losses for excess profits tax purposes by 50% of the interest on borrowed capital. These claims were disallowed on March 18, 1952. The original complaint in this case, based on the first claims, was filed on March 11, 1952, and the amended complaint filed on April 15, 1952.

None of the penalty interest, which has been in default since September 1, 1931, has ever been paid. At various times the District Court has entered orders directing the trustees to pay in cash the unpaid coupon interest. The latest order was July 31, 1952, ordering the payment of interest matured through September 1, 1936. Each of these orders contain the following provision:

"The Court expressly reserves for future determination the claim of holders of First and Refunding Mortgage bonds to be paid interest upon the overdue installments of interest upon said bonds since the maturity thereof and this order shall not be construed as affecting the rights of said bondholders with respect thereto; nor shall acceptance by the holders of the First and Refunding Mortgage bonds of an amount equal to the face value of the coupons, nor the delivery by them to the Trustees of any coupon or coupons on said bonds, constitute an estoppel against or a waiver of, or in any way prejudice or affect the claim of the holders of said bonds and coupons for interest on overdue coupons or the installments of interest herein ordered to be paid."

■ Ordinarily, of course, a taxpayer on the accrual basis must accrue interest in the year in which it becomes due, and such an accrual is a deduction within the

provisions of Section 23 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23.

The Government's contention that such deduction is not allowable under the circumstances of this case, is twofold: (1) The agreement contained in the mortgage indenture to pay interest on past due interest coupons is either void under the applicable federal law or void as being against public policy under the law of the state of New York, which the Government says is the state with reference to whose internal laws the legality of the contract must be determined, if determined by state law: (2) Interest that in all likelihood can never be paid, even though legally due, cannot be accrued if it is interest on interest.

This question of the propriety of the deduction of interest on bond coupons is anything but simple, and unless our process of reasoning toward its solution is scrupulously methodical, we may overlook a fundamental principle or accept too easy a solution.

■ To begin with first principles, this question is one arising under the statutes of the United States; those statutes being next to the Constitution the supreme law, it is in them that we should first look for the solution. We are free to construe those statutes by the principles generally accepted in the federal courts, without recourse to the law of any state; and in areas where Congress has legislated extensively so as to establish a general policy, that *policy* may furnish the answer to a particular question, even though the federal statutes do not expressly answer it, and though a state statute expressly enacts a contrary rule. Of course, in the process we must bear in mind what is even more fundamental, that our construction of the federal statute must not have the effect of a deprivation of property without due process of law. But, failing a complete solution in the federal statutes (and the penumbral area where Congress has so "filled the field" that state law can have no application) we may then properly look to the foundation of legal interests and relationships created only by state law, to which the federal statutes must be related either because by their terms they postulate such interests and relationships, or because constitutional limitations of federal power require this.[1] As we look to the state law, it is apparent in this case that there may be a question of Conflict of Laws, both Florida and New York having some relation to the matter. This poses a question which, before proceeding further, we must answer or be prepared to demonstrate makes no difference in the result; namely, does federal law determine Conflict of Laws questions in non-diversity cases, or do the conflicts principles of the

---

[1]. "By hypothesis, the national law nearly always must operate on some foundation of preexisting state interests. If national common law is used to define the legal interests instead of state law, a too vigorous application of the national law might easily raise a substantive due process question * * *. If the national government should attempt to adopt its own substantive definitions of state-created interests on which national causes of action rest, a situation may develop in which a person is subjected to burdensome nationally created duties and liabilities as the holder of such state-created interests for the purpose of the national cause of action. At the same time, when this individual attempts to assert his rights as defined by the national government, the state courts may refuse and the federal courts will be compelled to refuse under the doctrine of Erie v. Tompkins to enforce the same interest. Thus a person may be taxed on a non-existent interest." Note, 47 Columbia L.Rev. 629, 631. Cf. Mr. Justice Frankfurter's remarks, concurring in Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 168–169, 67 S.Ct. 237, 243, 91 L.Ed. 162: "In this case, it was beyond the power of federal law to create the right [i. e., to interest on interest] for which claim was made, although, if by State law such a right came into being, it might become a question whether the federal courts should recognize such a right when they are sought to be utilized as instruments for its enforcement. * * * The law that fixes legal consequences to transactions is the law of the several States."

state where the case arises control? Beyond that hurdle, there is another perhaps more formidable; what is the conflicts rule of the jurisdiction thus selected to determine the choice of law? And finally, we are met with the question, what is the rule of substantive law of the jurisdiction thus selected to determine the substantive law?

This, then, seems to be the natural order (which we shall follow) to consider the various matters involved: (a) Whether the federal statutes alone are determinative of the ultimate question; (b) If not, whether Florida conflict of laws or a distinct federal rule of conflicts applies in this non-diversity situation; (c) Whether the applicable conflicts rule requires application of Florida or New York internal law to determine the validity of the interest; and (d) Whether the applicable state's internal law rules make the interest a legal obligation.

■ The Government contends, to begin with, that two federal statutes make the deduction improper, irrespective of validity of the interest under state law. Internal Revenue Code, § 23, 26 U.S.C., 1940 and 1946 Eds. § 23; and U.S.C.A. Title 11, "Bankruptcy," generally. It says that under § 23,[2] "even if [the interest] was a legal obligation it is not accruable and deductible for income tax purposes in view of the fact that there is little or no likelihood that it will ever be paid," and cites Prudence Securities Corp. v. Commissioner, 2 Cir., 135 F.2d 340, as supporting its position. However, in the Prudence case the obligation to pay interest was conditional, and the conditions never having occurred, there was no present liability. That case is not authority for the proposition that interest for which an accrual basis taxpayer is presently and unconditionally liable, but which is unlikely to be paid simply by reason of his insolvency, is not deductible. On the contrary, the court distin-

guished the latter type of case in **Prudence**, citing Zimmerman Steel Co. v. Commissioner, 8 Cir., 130 F.2d 1011, 143 A.L.R. 1054, which squarely held that interest legally owed is deductible by an insolvent accrual basis taxpayer. Pierce Estates v. Commissioner, 3 Cir., 195 F.2d 475, is distinguishable here on the same ground as Prudence. The Trustee, on the other hand, relies upon (in addition to the Zimmerman case) I.T. 3635, 1944 Cum.Bull. 101; Keebey's, Inc., v. Paschal, 8 Cir., 188 F.2d 113; Edward L. Cohen, 21 T.C. 855, Acq. 1954–30 Cum.Bull. 5; D. J. Jorden, 11 T.C. 914, Ack 1949–2 Cum.Bull. 2; Panhandle Refining Company, 45 B.T.A. 651; Shamrock Oil and Gas Company, 42 B.T.A. 1016; Hummel-Ross Fibre Corp., 40 B.T.A. 821. These authorities hold that simple interest is deductible if legally owed, notwithstanding the probability that it may not be paid. The Government says that a different rule should apply to interest on interest not likely to be paid. But we are asked to construe a statute, and we see no basis for such a distinction in § 23. That section simply provides for deduction of interest accrued "on indebtedness." Certainly interest payable is a kind of indebtedness, whether it is likely to be paid or not. If other interest is *legally due* on that indebtedness, it falls within the terms of § 23; there is nothing in that section to differentiate it from interest on any other indebtedness. Interest is recognized as a legal obligation whether all, part, or none of it will be recovered in bankruptcy proceedings; for example, consider the rule that a promise to pay a debt barred in bankruptcy is enforceable without consideration—the law recognizes that some kind of obligation still exists. We conclude that § 23 does not preclude the deduction of interest on interest, not even if the latter is unlikely to be paid. Neither does it expressly permit such deduction; but by postulating a preexisting legal lia-

2. § 23: "In computing net income there shall be allowed as deductions: * * * "(b) Interest. All interest paid or ac-

crued within the taxable year on indebtedness, except * * *." (None of the exceptions apply here.)

bility for interest, it necessarily bases deductibility on the law creating such liability, namely state law.

But it may be supposed that the federal bankruptcy laws can affect deductibility also. So the Government contends. Let us now proceed to the consideration of that argument. The Government's argument with reference to the bankruptcy laws is founded upon the Supreme Court's decision in Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct. 237, 241, 91 L.Ed. 162. That case was based upon a construction of 11 U.S.C.A. §§ 205 and 515, which give bankruptcy courts the powers of a court of equity, to the effect that regardless of the validity of a claim for interest on bond coupons under state law, the bankruptcy court must "balance the equities" and refuse to permit payment of such a claim, where payment of the coupons themselves was suspended by order of the bankruptcy court and where payment of interest on the coupons would cause a loss to other creditors. The Vanston case seems to us to establish a rule only for the distribution of a bankrupt's assets. It did not hold that such a claim was void, but only that the claimant should not

participate in the distribution of assets until all claims superior in conscience and fairness were paid. Certain language in the majority opinion, it is true, seems to imply that such a claim is void;[3] however, that language seems to us an inadvertent confusion of the concepts of *allowance* of a claim and *postponing* or *subordinating* it *(i. e.,* refusing a valid and allowed claim to participate in the distribution, when the assets are insufficient to pay claims justly entitled to priority).[4]

█ We are aware that in affirming the decision of the Sixth Circuit, In re American Fuel & Power Co., 151 F.2d 470, 483, the Supreme Court gave effect to its mandate reversing the District Court's judgment "with respect to the *allowance* of interest upon the interest coupons" (emphasis added), but reading the Supreme Court's opinion as a whole, we are convinced that it thought of allowance of the claim in a very loose sense. For disallowance in the technical sense means that the claim is nonexistent, but we think it is clear from the Supreme Court's opinion that it did not mean that the interest on the bond coupons was void, but simply that it should be subordi-

---

**3.** E. g., "* * * an *allowance* of interest on interest under the circumstances shown by this case would not be in accord with the equitable principles governing bankruptcy distributions." (Emphasis added) 329 U.S. 156, 163, 67 S. Ct. 237, 240.

**4.** This distinction is explained in 3 Collier on Bankruptcy (14th Ed.) ¶57.14:

"Allowance and disallowance are judicial acts. Jurisdiction to allow and disallow is based on § 2, sub. a(2), 11 U.S.C.A. § 11, sub. a(2), and the jurisdiction of the bankruptcy court in this respect is exclusive of all other courts. In passing on an allowance of claims the court sits as a court of equity, which gives it far-reaching powers 'to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate.' [Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, 41 Am.Bankr. Rep.,N.S., 279.] Mere reasons of equity may sometimes require that a creditor's claim be either totally disallowed or sub-

ordinated to the claims of all or of certain other general creditors, such as where the creditor is closely related to the bankrupt, or as a majority stockholder or corporate officer should be treated as a proprietor rather than as a creditor, or where by previous conduct he is estopped to claim parity with other creditors. Equities to be weighed in connection with the allowance of a claim may vary in importance. *They may in extreme cases be strong enough to warrant disallowance absolutely and entirely.* In other cases equity may be satisfied with a mere 'subordination,' or postponement of a claim, and its relegation to a rank inferior to that of all general creditors or of a particular group. *In the case characterized as 'extreme,' the order of disallowance negatives the very validity and existence of the claim. * * ** A claim that for reasons of equity must be postponed *should be allowed* and the postponement incorporated in the order of allowance as a qualification thereto." (Emphasis added.)

nated to the claims of general creditors. This is borne out, we think, by the Court's repeated references to "distribution of assets among the bankrupt's creditors." 329 U.S. 156, 161, 163, 164, 67 S.Ct. 237, 239. Of course, if a claim is disallowed, the claimant is to that extent held to be no creditor at all, so no question of distribution to him could possibly arise. Any reference to distribution among creditors would be unnecessary and inapposite if the Court really meant to hold the claimants of interest on the coupons had no claim at all for this amount.

■ There is a further reason for rejecting the Government's contention that Vanston holds that a bankruptcy court can disallow and therefore declare void a claim, irrespective of its validity according to state law. Suppose that an obligation valid under state law is disallowed, that is, declared to be no obligation, in a bankruptcy court, and the debtor subsequent to discharge promised to pay it, or the bankruptcy court under 11 U.S.C.A. § 32, sub. c refused to grant the bankrupt a discharge; collateral estoppel would preclude the creditor from suing in a state court, would it not? And might not this deprivation of the creditor's cause of action in a state court raise grave doubts as to the constitutionality of the bankruptcy court's action? We think that it might. For the Supreme Court has recognized that the constitutional grant of power to Congress to enact uniform laws on the subject of bankruptcies, Art. I, § 8, Cl. 4, though plenary, nevertheless is subject to due process

clause limitations; too radical a departure from the common law concept of the effect of bankruptcy, or from the norms created by state law, may exceed federal bankruptcy powers. Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106; Wright v. Union Central Life Ins. Co., 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490.

Rather than ascribe to the Vanston case a meaning so out of keeping with the purposes of federal bankruptcy legislation, as we understand them, and not clearly implicit in the grant of equitable powers to bankruptcy courts, we interpret that case only as establishing the equitable power and duty of bankruptcy courts to subordinate such a claim.[5]

■ Of course, it is obvious that the state law creating an obligation could itself be void as conflicting with the federal Constitution, a federal statute, or a policy established by extensive federal legislation in a certain area; but we do not think the bankruptcy laws themselves can rightly be interpreted as rendering an obligation to pay interest on interest —certainly valid under the laws of most states—*void*. And since, as we concluded above, interest on an unconditional legal obligation is deductible for income tax purposes by an accrual basis taxpayer, notwithstanding the improbability of its being paid, it follows that *subordinated* interest, or interest on a *subordinated* debt may nevertheless be deducted, provided it is a valid obligation under state law.

---

5. According to our interpretation of Vanston, a state law regarding *priorities* may be held void by bankruptcy courts when it conflicts with the policies and equitable principles of federal bankruptcy law; but this presents no comparable constitutional difficulty. The federal statutes may be regarded as "filling the field" with respect to priorities, but certainly they do not with respect to the existence of obligations. As Mr. Justice Frankfurter said concurring in Vanston, 329 U.S. 156, 169, 67 S.Ct. 237, 243:

" * * * the law that fixes legal consequences to transactions is the law of the several states. Except for the very limited obligations created by Congress * * * a debt is not brought into being by federal law. Obligations exist or do not exist by force of State law though federal bankruptcy legislation is in force * * *."

The majority opinion may be reconciled with these unquestionably correct principles only if it is regarded, as we regard it, as not declaring the obligation (regardless of validity under state law) void, but merely as subordinating it.

Being unable then to resolve the question whether the deduction was proper, as a matter of purely federal statute, we are compelled to consider whether the obligation to pay interest on the interest coupons is valid under the applicable state law. However, we think that we can and should pretermit the question whether in a non-diversity action such as this, federal or Florida law governs the *choice* of the applicable substantive law, just as the Supreme Court did in Vanston, supra, and in D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956. In the interest of brevity we omit discussion of the arguments and authorities on this question, except to note that interpretation of the federal statute involved should always be the fundamental criterion in non-diversity cases. We do think that a given taxpayer's liability on a given state of facts should not depend upon where action is brought, and that a contrary holding would seem to be interpreting the statute incorrectly. Thus, geographical uniformity in the tax liability of a given person on given facts seems to us to be a more important criterion in interpreting the Internal Revenue Code than the uniformity of tax liability of different persons in different states on similar facts. Indeed, uniformity of the former sort may be even more important than uniformity of result in a given civil litigation, regardless of forum; and this last sort of uniformity is the very basis and object of the principles of Conflict of Laws. See Goodrich on Conflict of Laws (3d Ed.) § 4; Cheatham, "Federal Control of Conflict of Laws," 6 Vanderbilt L. Rev. 581.

In considering the Conflict of Laws aspects of this case, we encounter at the outset the question of "characterization." [6] Just what is the conflicts problem about; usury, or a kind of illegality of contract distinct from usury? According to the accustomed concepts of the common law system, it seems clear that the problem falls into the category of the charging of excessive interest, that is, usury; but the authorities relating to New York law relied upon by the Government appear to conceive of the matter as something distinct from usury, for they hold that a corporation may assert this defense, though it may not assert the defense of usury. See Empire Trust Co. v. Equitable Office Building Corp., 2 Cir., 167 F.2d 346. However, *in deciding how the matter should be characterized for conflict of*

---

6. Goodrich on Conflict of Laws (3d Ed.) § 9:

"Conflict of Laws situations are concerned with different systems of law. Sometimes the differences are substantial as when common law and civil law jurisdictions are involved. Although differences among most of the states of this country are not nearly as great as that, they do exist in varying degrees. A court deciding a conflicts case may be faced with the problem of whether it should resort to the concepts of its own legal system or those of the other system with which the case has contacts in analyzing and resolving the immediate questions before it. The choice of law rule and the outcome of the litigation may differ according to the course adopted by the court. This will be readily apparent if one supposes a case where, by the law of the forum, a given transaction is viewed as one of contract while by the law of the other place involved it is regarded as one of tort * * * [T]he practical solution would appear to be to resort, as a general rule, to the law of the forum in resolving questions of characterization * * *. It would be imposing a burden of no mean magnitude to require, as some have advocated, that concepts of foreign law or universal concepts or foreign concepts in the light of local concepts should be employed * * *. Note should also be taken of the caution that when it is said that concepts of the law of the forum are to be resorted to in resolving characterization problems, not the concepts of the purely internal law but the forum concepts for its Conflict of Laws rules are to be used."

See also, supporting this view, Restatement, Conflict of Laws § 7(a), Comment b; 1 Beale, Conflict of Laws § 7.2; and authorities collected by Goodrich, loc. cit.

*laws purposes,* it is clear that the law of the forum should control.[7] Either as a federal court or in the role of a Florida court, we conceive of the matter as one of usury for the purpose of applying conflict of laws rules; for the applicable body of conflicts rules (either federal or Florida) is predicated on a framework of either federal or Florida legal concepts, not this peculiar differentiation existing only in some New York cases.[8]

 Having characterized the problem as one of usury, we find that the American courts have treated that particular problem quite differently from other questions of validity of contract. The law determining the validity of a contract generally, is said to be the most confusing problem in the Conflict of Laws. Courts follow four or five different rules, and often there is no uniformity even in the cases from a single jurisdiction. But with respect to the question of usury, it may be stated as a well-established rule that a provision in a contract for the payment of interest will be held valid in most states if it is permitted by the law of the place of contracting, the place of performance, or any other place with which the contract has any substantial connection. Seeman v. Philadelphia Warehouse Co., 274 U.S. 403, 47 S.Ct. 626, 71 L.Ed. 1123; Lubbock Hotel Co. v. Guaranty Bank & Trust Co., 5 Cir., 77 F.2d 152; Smith v. Western & Southern Life Ins. Co., 5 Cir., 87 F.2d 839, 841; Armstrong v. Alliance Trust Co., 5 Cir., 88 F.2d 449; Brierley v. Commercial Credit Co., 3 Cir., 43 F.2d 730, certiorari denied 282 U.S. 897, 51 S.Ct. 182, 75 L.Ed. 790. A large number of cases supporting this view are collected in annotations in 62 L.R.A. 33, L.R.A.1916D 750, and 125 A.L.R. 482. In the Lubbock case, Judge Hutcheson, speaking for this court in reference to the conflicts rule relating to usury, said, 77 F.2d 152, 156:

"It is a presumption of law that parties to contracts intend them to be legal, rather than illegal, and doubts on that score must be resolved in favor of legality."

Professor Nussbaum writes in Money and the Law (Rev. Ed.) at page 167:

"The defense of usury has also been impeded judicially by * * * the assumption of the rule that in case of doubts, that is, the borderline situations, the contract should be deemed non-usurious. Where the loan, through domicile of the parties, place of contract or for other reasons is connected with several states of different usury policies, the commodious view has been taken that the court will apply that state law which is most favorable to the maintenance of the transaction."

The same author, in 51 Yale L.J. 893, 912, says:

"Now the Conflict law of usury has been developed in a peculiar way by the American courts. While in general a contract is void if it is illegal under the lex loci contractus, courts, uphold contracts if the contractual rate of interest conforms either with the lex loci contractus or with the lex loci solutionis or with any other place with which the transaction has a 'normal relation' [language of Stone, J., in Seeman v. Philadelphia Warehouse Co., supra] * * *, the policy being to give the parties a certain choice among the pertinent maximum interest rates * * *. [T]he usury rule * * * enjoys an undisputed existence."

See also 2 Beale, Conflict of Laws § 347.4, where cases from 23 states and federal courts are cited.

We thus conclude that if we were required to apply a federal rule of conflicts here, rather than choosing among the discordant rules relating to validity of contracts in general we would apply the

---

7. See footnote 6, supra.

8. Besides, it is apparent from the briefs of the parties herein and from the cases they rely upon, that they characterize or conceive of the problem as falling in the category of usury, as far as conflicts rules are concerned.

special rule applicable to usury, both because this is a comparatively well-settled rule, and because we would then find it unnecessary to decide the broader and more difficult question.

■ Furthermore, we are of the opinion that the Florida courts would reach the same result, either on this narrow ground or upon some broader rationale;[9] naturally we rely upon the narrow ground in order to decide as little Florida law as is necessary to the result. It is true that the 1897 case of Thompson v. Kyle, 39 Fla. 582, 23 So. 12, is contrary.[10]

■ However, we would be reluctant to follow an isolated holding,[11] especially one so old as this,[12] and so contrary to the weight of authority in other jurisdictions[13] with regard to the conflicts rule applicable to usury. The more recent cases, we think, indicate that a contrary result would now be reached, at least with respect to interest on bond coupons. City of Winter Park, Inc., v. Dunblaine, Inc., 121 Fla. 600, 164 So. 366, held that interest coupons payable in New York bore interest after maturity, even without express provision therefor. The record of that case shows the bonds were issued in Florida, but nevertheless, the case shows that Florida courts will go to some lengths to support interest on bond coupons, since it is generally accepted rule of Conflict of Laws that—entirely sep-

9. Besides adopting this usury rule settled in a plurality of American jurisdictions, the Florida courts could adopt several other courses leading to the same result; they could adopt with respect to the validity of contracts in general, the tests of intention or accumulation of contract points (also called "center of gravity"), thereby applying Florida internal law to hold the interest provision valid (see text at footnote 14 infra); or they could adopt the lex loci contractus or lex loci solutionis test as to validity of contracts in general, but then by applying the doctrine of renvoi, look to the New York law of conflicts, which now has adopted the center of gravity theory (Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99), and relate validity back to Florida internal law. It is possible also that they might apply New York internal law, but decide that the interest provision is valid under that law. It seems to us that the most generally accepted of these rationales is the one based on the narrow rule relating to usury. Assuming that we are called upon to decide a question of Florida conflicts law, it is appropriate that we place our decision on the narrowest and best established ground available. Consequently, we decide only that Florida would now follow the generally accepted rule of conflicts relating to usury.

10. That case held (1) the capacity of a married woman to execute a mortgage depends on the law of the situs of the land (Florida), not the law of her domicile or the place of execution (Alabama); (2) Whether a note is usurious depends on the law of the state where the note is made and is payable (Alabama), not the law of the situs of the security (Florida); and (3) "if by such laws all interest is forfeited for usury, the same result will follow, upon foreclosure of the mortgage securing it, in the state where the mortgage lands are situated." 39 Fla. 582, 597, 23 So. 12, 17. No doubt through excess of zeal, counsel for appellee says that this case means that a mortgage lien for interest held usurious by the proper law of the contract is nevertheless valid if the interest is not usurious by lex siti. Quoting out of context nearly a page of the opinion relating to point (1), appellee's brief makes a rather creditable argument to this end; however, the case actually does stand for the contrary proposition, as point (3) shows. The important thing here is not points (1) and (3), but whether this single 1897 holding on point (2) is still the law of Florida.

11. See the article by Judge Clark of the Second Circuit, "State Law, in the Federal Courts," 55 Yale L.J. 267, 292–293, warning against the uncritical following of isolated precedents in the state courts.

12. Especially since, as said in Goodrich on Conflict of Laws § 2 (3d Ed.): "Enunciation of principles of Conflict of Laws has been, in common law jurisdictions, a matter of very recent date."

13. Since uniformity of result is the basic object of the principles of Conflict of Laws, the courts of each state naturally pay attention to the holdings of courts of other states on conflicts questions. See 1 Beale, Conflict of Laws § 1.12.

arate and apart from the matter of usury —the rate of interest on a contractual obligation not stipulating otherwise is the legal rate at the place of performance. Restatement, Conflict of Laws § 418. Similarly, in Board of Public Instruction for Brevard County, Fla., v. Osburn, 5 Cir., 101 F.2d 919, where this court had before it the question whether Florida County school board bonds, payable in New York, bore interest after maturity though they did not provide for such interest, we held that they did bear interest, and applied Florida internal law without discussion of the conflicts point. Our opinion appears to indicate that interest on interest coupons in such a case would also depend on Florida internal law. 101 F.2d 919, 922:

"[I]n Jefferson County v. Hawkins, 23 Fla. 223, 2 So. 362, the question of interest after maturity was squarely raised touching a coupon, and * * * it was held to bear interest. *We see no difference* between an overdue coupon which promises no interest after maturity, and a bond which similarly makes no promise." (Emphasis added.)

See also State ex rel. Crane v. City of Lakeland, 116 Fla. 713, 156 So. 699, 157 So. 926; Skinner v. Southern Home Building & Loan Ass'n, 46 Fla. 547, 35 So. 67; Meredith v. City of Winter Haven, 5 Cir., 141 F.2d 348; Cf. Trustees of Internal Improvement Fund v. Lewis, 34 Fla. 424, 16 So. 325, 26 L.R.A. 743; County Commissioners v. King, 13 Fla. 451.

Thompson v. Kyle, 39 Fla. 582, 23 So. 12, seems to be the only strong authority that the law of the place of making and performance determines whether a con-

tract is usurious. Porter Interests v. Missouri State Life Ins. Co., 105 Fla. 550, 141 So. 741, is silent on the point; the statement in Mackey v. Thompson, 153 Fla. 210, 14 So.2d 571, 573, that lex loci contractus generally applies, is obiter.

We do not think that the Florida Supreme Court would now follow Thompson v. Kyle, supra. In the light of the above authorities, we think it would hold an express provision for interest on matured bond coupons valid, where the transaction bore such a substantial relationship to Florida as in this case, if valid by Florida internal law, regardless of the law of other states involved. And it is quite clear that a provision for interest on interest is valid by Florida internal law; this is expressly conceded by the Government. Panama City v. Free, Fla. Sup.Ct., 52 So.2d 133; Morgan v. Mortgage Discount Co., 100 Fla. 124, 129 So. 589.

Thus, we conclude that if we applied a federal rule or if we determined what result the courts of Florida would reach, the answer would be the same. We do not determine which road the trial court should have travelled to arrive at the common destination. We hold that the interest here is a legal obligation, deductible by an accrual basis taxpayer under 26 U.S.C. (1940 and 1946 Eds.) § 23(b), whatever the internal law of New York may be.[14]

We are next faced with the second major issue in the case as to whether the Commissioner was authorized to reduce the net loss carry-backs from 1947 and 1948 to 1945 and 1946 by 50%.

The answer to this question is found in

14. We find it unnecessary to discuss what the result would be under the internal law of New York. That is a subject on which the courts have not found themselves in agreement. Compare the concurring opinion of Frankfurter, Jr., in the Vanston case, supra, and Newburger-Morris Co. v. Talcott, 219 N.Y. 505, 510, 114 N.E. 846, 3 A.L.R. 287 with American Brake Shoe & Foundry Co. v. Interborough Rapid Transit Co., D.C.S.D. N.Y., 26 F.Supp. 954. In Empire Trust

Co. v. Equitable Office Bldg. Corp., 167 F.2d 346, the Second Circuit, in an opinion by Swan, J., carefully reviewed the New York authorities and held that although there was no decision by a New York court exactly in point, the New York internal law is that a provision for interest on bond coupons is void as against public policy. But this is inconclusive since the precise point still has never been decided by the N. Y. courts.

a construction of § 711(a) (2) (L) (i) of the Revenue Act of 1942, 26 U.S.C.A. See § 711 in conjunction with § 122(a) (b) and (c) of the Revenue Act of 1945.

Under the Excess Profits Tax Act of 1940, as amended in 1941, 1942 and 1943, 26 U.S.C.A.Int.Rev.Acts, pp. 22, 76, 280, 384, the tax was applied to a figure known as adjusted excess profits net income. In computing this figure the taxpayer was permitted to take a credit computed either under § 713 or § 714, "whichever amount results in the lesser tax under this subchapter for the taxable year for which the tax under this subchapter is being computed." 26 U.S.C.A. § 712. The alternative computation, authorized by § 714 is known as the "invested capital" as contrasted with the "income" method of computation.

In 1945 the excess profits tax was repealed by Section 122(a) of the Revenue Act of 1945, effective for any taxable year beginning after December 31, 1945. Thus, there would be no reason for any taxpayer to compute an excess profits credit for the years 1947 and 1948 here in question. None was computed.

The taxpayer here sustained losses in 1947 and 1948, part of which was attributable to interest on invested capital. The taxpayer sought to get tax advantages from these two loss years by carrying back the losses to the years 1945 and 1946, which increased the unused excess profits credit for 1945 and 1946 to be carried back to 1943 and 1944, the years in dispute here.

The Commissioner disallowed 50% of the interest deduction claimed in 1947 and 1948, as he contended, by virtue of the provisions of Section 711(a) (2) (L), which, in substance, provides that in computing the net operating loss for any taxable year and the net income for any taxable year *if the excess profits credit for "such taxable year"* [15] *was computed under the invested capital method,* the

deduction for interest should be reduced by an amount equal to 50% of the interest on borrowed capital. This determination of the Commissioner is supported by the Government on the statement in its brief that (although there was no longer any excess profits tax and no longer any purpose for computing any excess profits credit for the years 1947 and 1948) "it must be assumed that it *would have* computed it (the credit) for 1947 and 1948 in the same manner." (Emphasis added.)

While we recognize that the complexities arising from the necessarily involved provisions of the excess profits tax statutes are so great that the clear meaning of all of them may sometimes escape the most diligent and conscientious reader, we perceive no danger of such a failure here since the Government frankly bases its argument on such a proposition. The Commissioner says the interest deduction for 1947 and 1948 should be reduced by 50% (although no excess profits credit was computed at all, much less under Section 714) in spite of the fact that the law says the interest deduction shall be so decreased *only if* the excess profits credit was computed under § 714. Our conclusion that under the plain and unambiguous language of the law no such result can be justified is bolstered by the argument made by the Government that "it must be assumed that it (the taxpayer) would have computed it (the credit) in 1947 and 1948 in the same manner." Even if such assumption were a valid one it doesn't mean anything because it does not satisfy the condition of § 711(a) (2) (L), which is, that to authorize the reduction, the taxpayer must actually compute a tax credit on the invested capital method. It makes no difference what method of computing a credit *would* be used if such a credit were computed, because none was needed for 1947 and 1948 and none was computed.

---

15. It is apparent that the Government concedes that the words "such taxable year" mean the year of the loss, i. e., the years 1947 and 1948 and not the years 1943 and 1944, as to which years of course there was computed an excess profits credit by the invested capital method.

We have read the discussion of this same question in the several cases in which it has been litigated and we find ourselves in complete accord with the Tax Court which has twice taken the view expressed here,[16] and we cannot follow the reasoning that led the Court of Appeals for the Fourth Circuit to affirm per curiam the case of National Fruit Product Co. v. United States, 4 Cir., 199 F.2d 754, certiorari denied 345 U.S. 950, 73 S.Ct. 866, 97 L.Ed. 1373.

The judgment of the District Court is, therefore,

Affirmed.

16. Flory Milling Co., Inc., v. Commissioner of Internal Revenue, 21 T.C. 432, affirmed 3 Cir., 222 F.2d 903; and North Star Woolen Mill Company v. Commissioner of Internal Revenue, 22 T.C. 1237.