[Civ. No. 21103. First Dist., Div. Three. Apr. 30, 1964.]

WALTER URY et al., Plaintiffs and Appellants, v. JEWELERS ACCEPTANCE CORPORATION et al., Defendants and Respondents.

---

Dinkelspiel & Dinkelspiel, Norman Coliver, John F. Taylor, Alvin T. Levitt, Lenard G. Weiss and Michael I. Spiegel for Plaintiffs and Appellants.

Richards, Watson & Hemmerling, Clifford A. Hemmerling, Howard B. Miller and Douglas R. Page for Defendants and Respondents.

DEVINE, J.—Appellants are Walter Ury, individually and as sole general partner of Woulf & Ury Jewelers, and Woulf & Ury, Inc., a corporation, residents of the State of California; respondents are Jewelers Acceptance Corporation and SFC Acceptance Corporation, residents of the State of New York, and two representatives of the companies. Appellants, plaintiffs, seek declaratory relief, rescission or reformation of a contract, and penalties, all on the ground that the contract is usurious. Respondents have counterclaimed for an amount alleged to be due on the contract.

### Facts

Mr. Ury was in the retail jewelry and appliance business in Pittsburg, California, at all times relevant; and respond-

ent Jewelers Acceptance Corporation, referred to herein as JAC, was in the business of lending to retailers.[1] It had but six or seven clients, or borrowers, in California. In 1952 or 1953, an officer of JAC called on Ury, explained that the company made loans on accounts receivable, told him the rate of interest, and either at that or at a later time told him that JAC required that its customers incorporate in order to assure continuity of the business and of the loan in case of death or divorce. Ury applied for credit, but his application was rejected for lack of volume of business.

Correspondence went on between the two parties. During the visit of a JAC representative, a proposed agreement was shown to Ury, and Ury observed that it provided that the agreement was to be construed according to the laws of New York. A second application was rejected. Ury went to New York and discussed his earlier application. On his return to California, he received a letter stating that his application had been approved and that contracts would be prepared when a certificate of incorporation was sent. Ury engaged an attorney, formed the corporation, bought all of its stock, bought out the limited partner, and caused the assets of the partnership, including accounts receivable, to be transferred to the corporation.

The main contract is denominated "Revolving Fund Agreement." It was prepared by JAC, but is in the form of a proposal made by appellant corporation to be accepted by JAC, as it was, in New York. It commences with reference to borrowing in New York. It ends with the provision that "This agreement and said Notes shall be construed pursuant to the Laws of the State of New York." Payments were to be monthly, 1/18th of 1 per cent per day of the average daily balance during the preceding month. This resulted in an interest rate of 20.3 per cent per annum. As stated below, the California Constitution forbids interest at a rate in excess of 10 per cent, except for certain exempt lenders. In New York the permitted rate is 6 per cent, but in that state the defense of usury is not available to a corporation which is a borrower.

The retail jeweler sold merchandise at a markup of at least

---

[1]The other respondents need not be considered separately; JAC is the active respondent throughout. In this opinion, the term JAC is used for convenience even where findings, etc., occasionally refer to its successor. The term appellant is used in the singular because plaintiff corporation is the interested party.

100 per cent and made an additional charge on credit sales, the net amount of which is not clear. Appellant would forward contracts with his customers to JAC, which would deposit up to 50 per cent in a New York bank in appellant's name, as appellant would sign promissory notes to JAC. Payments by appellant's customers were deposited in an account in JAC's name in a Pittsburg bank. The system went on for about four years. Then appellant withheld payments on the ground that it had made usurious payments.

*Findings of Fact, Conclusions of Law and Judgment*

The trial judge found that the agreement was made in New York, that the notes were valid in that state and the customers' conditional sales contracts were assigned to JAC in New York; that New York had substantial contacts with the agreement and the notes, and that the laws of that state were selected by appellant in good faith and not as a device to evade the usury laws of California. He found that JAC did not make the agreement with the intent of evading the usury laws. He found, or concluded, that: "Under the laws of New York a proposed lender may require a proposed non-corporate borrower to incorporate as a condition of the loan and such corporation may not thereafter assert the defense of usury if the loan is actually made to the corporation so formed, provided the parties deal with each other with the usury laws before their eyes, either actually or constructively, and provided the corporate entity is not used as a cloak or cover for illegality."

The judge gave conclusions of law that the laws of New York govern the validity, enforceability and interpretation of the agreement and of the notes; that the agreement and notes are valid and enforceable in that state, and that the New York law which prevents a corporation from pleading usury is a substantive, not a procedural, rule of law; that the contracts do not violate any public policy of California; that "California does not have such significant relationships with the transaction that its governmental interest required application of its own usury laws rather than the significantly different usury laws of New York"; and that "Plaintiffs are conclusively presumed to have known the laws of New York and California."

Judgment was given respondent for principal and interest, and attorneys' fees ($6,000 was the amount of fees), in amount $40,807.68, plus interest from date of calculation to judgment.

### Decision in Respect of Conflict of Laws

■ There is substantial evidence to sustain the trial court's finding that the contract was made in New York. It was in that state that the last act necessary to the contract, the acceptance, was performed, and this is regarded the place of making the contract. (*Michelin Tire Co.* v. *Coleman & Bentel Co.*, 179 Cal. 598, 604 [178 P. 507].) It is true that JAC arranged it this way, rather than sending an offer to be accepted by appellant in California, but appellant was a business man, dealing largely in credit transactions, and he had counsel available. Under generally accepted principles of conflict of laws applicable when the first Restatement was written in 1934, establishing of the *lex loci contractus* would have been sufficient. (Rest., Conflicts of Laws, § 332(e).)

■ Undoubtedly, the place of making the contract is of less significance now than it was then. (Leflar, *Conflict of Laws*, 1960 Annual Survey of American Law, pp. 24, 41.) It is, however, a factor to be considered with others, and at the least to the extent that it negatives whatever contrary effect there might be if the contract were made in the state of the forum. The place of making is not a mere "mailbox" happening in this case, but a deliberate selection.

More important than the *lex loci celebrationis* in determining the applicable law is the *lex loci solutionis*, the law of the place of principal performance. In appellant's brief, a list is given of activities done in California (signing of the separate notes and assignments, making of reports to be sent to New York, collecting on the conditional sales contracts of the buyers of jewelry, submitting books to audit by JAC accountants), but the counterpart of all or most of these was in New York. Essentially, the transaction was one of lending money and repaying it. The money was made available to appellant in New York, by deposit to its bank account there, and it was repaid in New York. (Interest was always repaid there, by check, and principal was paid there after the first 18 months. In the first 18 months, deposits were made by appellant in JAC's account in Pittsburg, California, and duplicate deposit slips were mailed to JAC in New York.)

■ The place of payment is to be regarded as the place of performance of a lending agreement. (*Kraemer* v. *Coward*, 2 Cal.App.2d 506 [38 P.2d 458].) The validity of a lending bargain has generally been held to be governed by the law of the place of performance. (6A Corbin on Contracts, § 1509, pp. 703-704; *Seeman* v. *Philadelphia Warehouse Co.*, 274 U.S.

403, 407 [47 S.Ct. 626, 71 L.Ed. 1123, 1126] ; *Santoro* v. *Osman,* 149 Conn. 9 [174 A.2d 800].)

Weight is added to the above by the fact that the court found that respondent did not do business in California and had no office here. (*Merchants' & Manufacturers' Securities Co.* v. *Johnson* (8th Cir.) 69 F.2d 940.)

■ Another significant element is the agreement of the parties as to the law that is to apply. (*Seeman* v. *Philadelphia Warehouse Co., supra,* at p. 408 [71 L.Ed., pp. 1126-1127].) ■ It is stated that the contract is to be construed pursuant to the laws of New York, and respondent need not rely on the presumption that Ury read this, because Ury admits that he did. Appellant argues that this provision means only that in case of ambiguity, the contract would be interpreted according to New York law, and that it does not refer to the governing or enforcing of the contract.

The quoted portion is not nearly so broad as those in other cases which have made it plain that the parties have chosen that the law of a certain state shall prevail in all matters concerning the contract, such as: "all transactions hereunder shall be governed and construed by the laws of the State of New York" (*Consolidated Jewelers, Inc.* v. *Standard Financial Corp* (6th Cir.) 325 F.2d 31, 33) ; or "All questions arising on this contract ticket shall be decided according to English law with reference to which this contract is made" (*Siegelman* v. *Cunard White Star, Ltd.* (2d Cir.) 221 F.2d 189, 192).

Nevertheless, the provision in the contract is not without its effect. In the first place, it tends to dissolve any idea that the parties intended the usury laws of California to apply, and the two elements mentioned above, the place of making and, more significantly, the place of performance (which are the same in this case), provide the applicable law, absent an expression otherwise in the contract. The provision has a positive effect as well, although not so strong a one as in the examples cited and others which might have been given. If the contract were usurious, it would be void in New York (19 McKinney's Consolidated Laws of New York Ann., § 373; *In re Falk* (S.D.N.Y.) 83 F.Supp. 817, affd. 180 F.2d 562) ; but if New York law applies to the whole contract it is quite valid, because the statute denying the defense of usury to a corporation is a rule of substantive law (*Sohmer Factors Corp.* v. *278 Corp.,* 13 N.Y. Misc.2d 142 [172 N.Y.S.2d 886], and has the effect, in New York, of repealing the usury laws

as to corporations. (*Butterworth* v. *O'Brien*, 23 N.Y. 275; *Moers* v. *American Exchange National Bank*, 208 App.Div. 473 [203 N.Y.S. 727]; *Sohmer Factors Corp.* v. *278 Corp.*, *supra*; *In re International Raw Material Corp.* (2d Cir.) 22 F.2d 920.) Even if the provision, in stating that the contract is to be construed according to the laws of New York, means that it must be merely interpreted, in case of ambiguity, by the laws of that state, it must be inferred that the parties intended it to be a valid contract, else there would be nothing to interpret; and if they intended more, that the contract as a whole is to be regarded in the light of the New York laws, then, of course, it is valid because of that state's elimination of corporations from the law of usury. ▮ We need not decide, and we do not, that this provision in the contract would cause New York law to apply if the transaction had no substantial connection with New York. But because the place of making the contract and the place of performance are the State of New York, we apply the rule of validation of contracts, and hold that the contractual provision amounts to a selection by the parties that the laws of New York shall govern the contract. Parties naturally expect that the obligations of a contract will be fulfilled. (See *Bernkrant* v. *Fowler*, 55 Cal.2d 588, 596 [12 Cal.Rptr. 266, 360 P.2d 906].)

We are aided in this construction of the clause in the contract by the presumption against the existence of usury in a contract which has been stated in California cases. (*Giorgi* v. *Conradi*, 199 Cal.App.2d 82 [18 Cal.Rptr. 588]; *Lindsey* v. *Campbell*, 132 Cal.App.2d 746, 749-750 [282 P.2d 948]; *Coley* v. *Wolcott*, 103 Cal.App. 140 [284 P. 241]; *Garrick* v. *J.M.P., Inc.*, 150 Cal.App.2d 232, 236 [309 P.2d 896].) It has been held that a contract is to be construed so as to make it valid even though foreign law must be applied in order to reach this result. (*Robbins* v. *Pacific Eastern Corp.*, 8 Cal.2d 241 [65 P.2d 42].) In the *Robbins* case, the court construed an agreement which was ambiguous as to place of delivery of stock as being New York rather than California, because the contract would be valid in New York but invalid if it were to be performed in California (p. 274), and New York had a normal and reasonable connection with the transaction (p. 272). In *Terry Trading Corp.* v. *Barsky*, 210 Cal. 428, 434 [292 P. 474], the court, in a doubtful case of conflict, chose the California law as less drastic than the New York law, which would have made an usurious contract wholly void (the borrower was not a corporation). In the case before us, the place of performance is New York and it is reasonable to

interpret the contractual provision, limited though it is in its terms, as calling for application of the law of New York in order to give additional weight to the validity of the whole agreement.

We now discuss the proposition of appellant that if we assume that a contract, generally made and to be performed as this one was, and containing its provisions, should be governed by the law of New York, nevertheless, to enforce it would violate public policy of California, as expressed in our law, the law of the forum, and that our courts should not do this.

█ (a) It is argued that the agreement is a "contract of adhesion." We shall not attempt to define such a contract, but we observe that the term has been applied to standardized contracts, in which there is disparity in bargaining power between the draftsman and the second party, who must "adhere" completely or forego the product or service. Such contracts, or clauses therein, may, under certain circumstances, be denied enforcement. (*Steven* v. *Fidelity & Casualty Co.*, 58 Cal.2d 862 [27 Cal.Rptr. 172, 377 P.2d 284].) The court concluded that the agreement in this case is not a contract of adhesion. Despite the heady atmosphere that envelops a conflict of laws case, the earthbound rule applies which holds us to all reasonable conclusions and inferences of the trial judge. The conclusion here is a reasonable one. The contract was made after extensive negotiation; Mr. Ury was a persistent applicant; he went to New York to promote his cause; he had advice of counsel in forming the corporation; and the trial judge may have inferred, reasonably, that legal advice on the whole transaction was, therefore, readily available. █ The facts that the form is a standardized one and the borrower needed the loan are common to most loan transactions, and they do not place this one in the exceptional class of adhesive contracts. The form is by no means one of those fine print specimens which make comprehension of terms a fiction. Mr. Ury testified he read it.

(b) In general, the courts have treated commercial loan transactions in a special manner and have enforced contracts which are valid in the state of making and performance although they are usurious in the state of the forum, where all or even some of the factors given above are present. (2 Beale, Treatise on the Conflict of Laws, § 347.4, p. 1241; Leflar, Conflict of Laws, § 131, p. 248; Goodrich, Conflict of Laws (3d ed.) p. 334; 6 Williston, Contracts (rev. ed.) p.

5097; Nussbaum, *Conflict Theories of Contracts*, 51 Yale L.J. 893, 912; 2 Wharton, Conflict of Laws, § 510(o), pp. 1209-1210; *Seeman* v. *Philadelphia Warehouse Co., supra*, 274 U.S. 403 [47 S.Ct. 626, 71 L.Ed. 1123]; *Fahs* v. *Martin* (5th Cir.) 224 F.2d 387.) In *Fahs* v. *Martin*, the court, citing cases, says: "But with respect to the question of usury, it may be stated as a well-established rule that a provision in a contract for the payment of interest will be held valid in most states if it is permitted by the law of the place of contracting, the place of performance, or any other place with which the contract has any substantial connection." (P. 397.)

(c) The law of conflicts, however, is in a condition that is by no means static. Strong public policy of the forum, which always has been a consideration, is surely no less regarded now. Appellant's contention that California has a strong public policy against any contract which is usurious according to the law of this state, must be examined.

That California does not have such a strong public policy against any and all contracts which would be usurious if they were made and to be performed here, appears from the fact that the constitutional prohibition of usury, section 22, article XX, of the California Constitution, enacted by initiative, exempts from its provisions banks, building and loan associations, industrial loan companies, credit unions, licensed pawnbrokers and personal property brokers, and several other kinds of lenders, and gives the Legislature the right to prescribe maximum limits for the exempted lenders. A strong public policy, based on a settled concept of justice or morality would not be meshed with such alterable rates as the Legislature might choose to impose. In fact, the Legislature has imposed no maximum rates for banks. The loan in this case, if it had been made by a bank in California and was payable here, could be enforced.

In *Nevcal Enterprises, Inc.* v. *Cal-Neva Lodge, Inc.*, 194 Cal.App.2d 177 [14 Cal.Rptr. 805], it was held that a contract for sale of a gaming establishment in Nevada is not essentially in conflict with the public policy of California, in view of our legitimized horse racing, and suit for accounting would lie.

Bearing in mind, however, the rather mobile condition of the law of conflicts, and the desirability of a limited decision in a field of complex and evolving law, we make reference to the particular contract herein, and we do not say that all contracts which are usurious according to California law would be enforced by the courts of this state, provided

they are valid where they are made and to be performed, and where the parties have chosen to have the law applied. We consider the particular contract. This contract, the court found, does not bear an unconscionable interest rate. The rate was 20.3 per cent. Appellant charged his own customers, above a profit gained by markup, a rate which we find it hard to determine from the record, but which was almost 10 per cent according to the reckoning most favorable to appellant. The rate permissible to personal property brokers is 30 per cent per annum up to $200, 24 per cent from $200 to $500, 10 per cent over $500, but there is no limit on loans over $5,000. (Fin. Code, §§ 22451, 22053.) On small loans, presumably made to the most necessitous borrowers, a charge of 30 per cent per annum may be made on balances up to $100, and 24 per cent on the excess. (Fin. Code, § 24452.)[2] A strong public policy against the particular rate in this contract is not to be found.

Appellant argues that the contract would have been unenforceable even in New York. Two propositions are put forth, which we discuss separately.

(1) It is the law of New York that a loan contract is not invalid even if a lender and a borrower agree that the latter shall incorporate so that the usury law will not apply. (*Jenkins* v. *Moyse*, 254 N.Y. 319 [172 N.E. 521, 74 A.L.R. 205]; *Bloom* v. *Hardwick's Hilltop, Inc.*, 19 Misc.2d 758 [185 N.Y.S.2d 377].) In the *Jenkins* case, it is said that the parties have a right to deal with each other "with the usury laws before their eyes." (172 N.E. at p. 522.) Appellant argues that Ury did not have the usury laws of New York "before his eyes" and that the rule stated above should not apply. ▇▇▇▇ But when a California resident contracts regarding the law of another state, he is presumed to know those laws. (*Keystone Driller Co.* v. *Superior Court,* 138 Cal. 738, 745 [72 P. 398]; *Pinney* v. *Nelson,* 183 U.S. 144 [22 S.Ct. 52, 46 L.Ed. 125].) We do not regard the words in the *Jenkins* case as requiring actual instruction on the law of New York to have been given in advance of the contract.

(2) Appellant's next argument is that if the substantive law of New York applies, the New York law of conflicts applies, too. This is what is known as the doctrine of renvoi. Then, says appellant, by *Auten* v. *Auten,* 308 N.Y. 155 [124 N.E.2d 99, 50 A.L.R.2d 246], New York recognizes the

---

[2]The statutes express percentages per month. Those given above have been translated to yearly basis, for comparison.

"center of gravity" or "grouping of contacts" proposition for determining which law should be applied. We refrain from saying whether the rarely used doctrine of renvoi is to be recognized in general. (It is commonly rejected as causing hopelessly circular reasoning; see *Haumschild* v. *Continental Casualty Co.*, 7 Wis.2d 130 [95 N.W.2d 814], and authorities cited therein.)[3] It is sufficient for us to agree with the holding of *Crylon Steel Co.* v. *Globus* (S.D.N.Y.) 185 F.Supp. 757, that the rule of the *Auten* case (a marriage case) does not apply to the usury cases which are treated as special conflicts problems, particularly subject to the rule of validation.

We cannot analyze all of the cases cited by appellant, but because he selects *Mirgon* v. *Sherk*, 196 Wash. 690 [84 P.2d 362] as the most relevant, we point out the distinction that there the lender set up offices in the borrower's state, and the loan was made in the borrower's state.

### The Issue of Illegality Because of Lack of License

At this point in appellant's brief, reference is made to the fact that respondent was not licensed as a personal property broker in California, and it is suggested or claimed that this precludes or limits recovery on the counterclaim, irrespective of the question of usury. This issue was tardily raised. It is not mentioned in the pretrial conference order. After submission of the case, appellant moved to reopen to produce additional evidence that respondent was lending to California borrowers. There was no showing of diligence. The court denied the motion.

Even if we consider the issue as made for the first time on appeal, we find that it cannot be solved merely by applying sections 22461 and 22652 of the Financial Code. The latter makes void contracts proscribed in the division of the code, and the former proscribes negotiating in this state a loan to be made outside the state for the purpose of evading or avoiding provisions of the code. But the court found that the parties did not have the purpose of evasion, a finding readily sustainable by the evidence. Financial Code section 22459 validates any loan made lawfully outside this state to the extent of interest allowable in the state. Loans of more than $5,000 are not limited as to interest. (Fin. Code, §§ 22053,

---

[3]In tentative draft No. 6 of Restatement (Second) Conflict of Laws, section 332, comment c, the renvoi doctrine is stated to be inapplicable to contracts. See Reese, *Conflict of Laws and the Restatement Second*, 28 Law and Contemporary Problems, No. 4, pp. 679, 694.

22451.) The loan in this case amounted to $28,746.22, principal amount. If appellant had desired to contend that the transaction should be considered a series of loans under $5,000, the matter should have been timely presented to the trial court.

### Attorneys' Fees

 Appellant contends that attorneys' fees should not have been awarded because, although the pretrial order allowed respondent to amend the counterclaim to include pleading fees, actual amendment was not made. The pretrial order, however, also directly states that attorneys' fees are an issue. The order is controlling. (Cal. Rules of Court, rule 216.)

Judgment affirmed.

Draper, P. J., and Salsman, J., concurred.

A petition for a rehearing was denied May 29, 1964, and appellants' petition for a hearing by the Supreme Court was denied June 24, 1964.