Filed 10/31/24  DeLuca v. American Express National Bank CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BRUCE DeLUCA,<br><br>　　　Plaintiff and Appellant,<br><br>　　　v.<br><br>AMERICAN EXPRESS NATIONAL BANK et al.,<br><br>　　　Defendants and Respondents. | B331238<br><br>(Los Angeles County<br>Super. Ct. No. 21SMCV01119) |

　　　APPEAL from orders of the Superior Court of Los Angeles County, Mark A. Young, Judge.  Affirmed in part and reversed in part.

　　　Tesser Grossman, Brian M. Grossman, Alec Pierce for Plaintiff and Appellant.

　　　Morgan, Lewis & Bockius, Brian C. Frontino for Defendant and Respondent American Express National Bank.

　　　Loeb & Loeb, Jerry S. Phillips and Edward Capewell for Defendant and Respondent TJB Gearys, LLC.

_____

Bruce DeLuca sued American Express National Bank (American Express) and TJB Gearys, LLC (Gearys) for malicious prosecution, alleging the bank and jeweler filed a false police report accusing DeLuca of purchasing an expensive watch with a stolen credit card.  DeLuca appeals from orders compelling arbitration of the dispute and confirming an arbitration award.

DeLuca contends the trial court erred in compelling arbitration and confirming the award because (1) he did not consent to arbitration and (2) the arbitration was corrupted by the arbitrator's refusal to disclose the identity of counsel adverse to American Express in another matter before the same arbitrator.

We conclude that DeLuca agreed to arbitrate all card-related disputes with American Express but not with Gearys, which was not a party to the arbitration agreement and cannot enforce it under the doctrine of equitable estoppel.  We further conclude the arbitration was not corrupted.  Therefore, we affirm the court's orders as to American Express but reverse them as to Gearys.

## BACKGROUND

### A.    Arbitration Agreement

On October 4, 2019, American Express granted DeLuca's application to open a credit account.  The bank mailed DeLuca a credit card and a cardmember agreement governing the account.  The agreement provided that use of the card constituted acceptance of the agreement, which would be governed by Utah law.

The agreement contained an arbitration provision governed by the Federal Arbitration Act, 9 United States Code sections 1–

2

16 (FAA), and stated that DeLuca could reject the provision within 45 days after the first card purchase.

DeLuca, a Florida resident, made purchases with the card and regularly paid off the resulting balances. He never rejected the arbitration provision.

## B. Complaint

In June 2021, DeLuca sued American Express and Gearys for malicious prosecution, false arrest, intentional infliction of emotional distress (IIED), and negligence. He alleged that he presented his American Express card to purchase a $55,000 Rolex watch from a Gearys boutique in Century City. After verifying DeLuca's credit card and Florida driver's license, Gearys completed the purchase.

Later that day, DeLuca alleged, Gearys noticed that the name on the credit receipt for the purchase was Vida Yahgmai, not DeLuca. Gearys notified American Express, which recommended that Gearys file a police report. At around the same time, American Express informed DeLuca that the chip in his credit card was not working and issued him a replacement card.

DeLuca alleged that Gearys filed a report with the Los Angeles Police Department (LAPD), falsely alleging DeLuca purchased the Rolex with a stolen credit card. When LAPD asked American Express about DeLuca's credit card charges, the company provided a summary of unauthorized charges that had posted to Yahgmai's account, whose American Express card had been stolen. DeLuca alleged that American Express requested that DeLuca be prosecuted for the watch purchase.

DeLuca alleged that he continued to make charges on his American Express card and to regularly pay the statement

balances between November of 2019 and June of 2020. Included in those charges was the purchase of another Rolex watch from Gearys, which was completed without incident.

DeLuca alleged that based on Gearys's police report, the district attorney charged him with two counts of grand theft. He was arrested, but the district attorney ultimately dismissed the complaint, and on November 4, 2020, the superior court made a finding of factual innocence concerning the charges.

## C.      Court Proceedings

American Express and Gearys moved to compel arbitration of DeLuca's claims under the cardmember agreement, which they argued was governed by Utah law. Gearys argued that even as a nonsignatory to the agreement, it was entitled to compel arbitration based on the theory of equitable estoppel because DeLuca's claims were founded in and inextricably intertwined with obligations imposed by the agreement.

DeLuca opposed arbitration, arguing he was not bound by the cardmember agreement, which was governed by Florida law, because he never read it. In any event, DeLuca argued, Gearys was a nonsignatory to the agreement and could not enforce it under an equitable estoppel theory because his claims against the jeweler were independent of the agreement.

On January 5, 2022, the trial court, finding that DeLuca agreed to arbitration under either Utah or Florida law, and that his claims against Gearys were intertwined with the cardmember agreement, ordered the matter to arbitration.

## D.      Arbitration

The matter was arbitrated through JAMS, with retired judge Richard J. Suarez designated as the arbitrator by

4

agreement of the parties.  The record does not reflect when Suarez was designated.

Following discovery, the arbitration hearing occurred on November 16 and 17, 2022, with several people testifying for each side.

On December 6, 2022, after the arbitration hearing but before any award issued, Suarez notified the parties that he had been "selected to serve as an arbitrator" in another case that involved American Express and its counsel in the current proceedings.  We will refer to the other case as the "December 6 Arbitration."

DeLuca requested that Suarez disclose: (1) the name of the case and parties in the other arbitration; (2) the identity of all counsel involved; (3) the nature of the case; and (4) whether Suarez was serving on his own or with a panel.

Suarez denied the request, stating:  "[T]he nature of the case is an appeal which has entirely different issues of fact and law than this arbitration.  Judge Suarez is a member of a tripartite panel.  Judge Suarez has not done any work on the new matter."

The record does not reflect whether Suarez actually worked on the subsequent arbitration.

On March 2, 2023, Suarez issued his final award in favor of American Express and Gearys.  He found that (1) American Express and Gearys had probable cause to believe that when DeLuca purchased the Rolex from Gearys, he presented his card for verification but switched to Yaghmai's (stolen) card to complete the purchase; (2) American Express was not responsible for DeLuca's arrest because it learned of the incident only after the LAPD inquired about it, did not tell Gearys to file any police

5

report, and did not request that DeLuca be charged, which would have been immaterial anyway because the district attorney decides independently whether to file charges in a fraud case; and (3) DeLuca's negligence claim was barred by the absolute privilege set forth in Civil Code section 47. Suarez awarded Gearys $23,707.98 in costs.

**E.     Confirmation Proceedings**

Respondents moved to confirm the arbitrator's award and DeLuca moved to vacate it. DeLuca argued he did not agree to arbitrate the dispute with either American Express or Gearys, and the arbitration was corrupted by JAMS's failure to comply with Code of Civil Procedure section 1281.9, subdivision (a)(3), which obligated a proposed arbitrator to disclose the names of the attorneys involved in any other arbitration proceeding before the arbitrator.

In opposition to DeLuca's motion to vacate the award, Brian Frontino, American Express's attorney, declared that Suarez "did not ultimately serve as an arbitrator in the unrelated arbitration appeal and did not have any substantive involvement." It is unclear how Frontino knew this fact, but DeLuca does not dispute it.

The court confirmed the award. It found that JAMS was not required to disclose the names of the parties' attorneys in the December 6 Arbitration.

On July 11, 2023, the court entered judgment confirming the arbitration award.

## DISCUSSION

DeLuca contends no arbitration agreement exists with American Express because he did not read the "bill stuffer" cardmember agreement. DeLuca further contends the arbitration was corrupted by JAMS's failure to comply with

6

subdivision (a)(3) of Code of Civil Procedure section 1281.9. Even if there was an arbitration agreement, he contends, Gearys was not a party to it, and cannot enforce it under principles of equitable estoppel because his claims against Gearys are independent of any obligations under the cardmember agreement. (DeLuca does not contend that the dispute falls outside the scope of the putative arbitration provision of the cardmember agreement, nor that the arbitration proceedings were themselves irregular.)

Because the material facts are undisputed, we review de novo whether the trial court correctly granted respondents' motions to compel arbitration. (*Soltero v. Precise Distribution, Inc.* (2024) 102 Cal.App.5th 887 (*Soltero*); *Ford Motor Warranty Cases* (2023) 89 Cal.App.5th 1324, 1331.)

# I. DeLUCA'S APPEAL AS TO AMERICAN EXPRESS

DeLuca admits he entered into a credit contract with American Express (which he incorrectly characterizes as an "implied-in-fact" contract), but contends this contract exists outside the cardmember agreement because he did not read that agreement. Because he did not enter into the cardmember agreement, DeLuca argues, he did not agree to its choice of law or arbitration provisions.

As discussed below, we find that DeLuca entered into the cardmember agreement and that the agreement requires arbitration in this case. We also conclude the arbitration was not procured by corruption.

## A. DeLuca Entered the Cardmember Agreement
### 1. Contract Formation

The FAA provides that a "written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable,

7

save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.)

"Private arbitration (also called contractual or nonjudicial arbitration) 'is a procedure for resolving disputes which arises from contract; it only comes into play when the parties to the dispute have agreed to submit to it.' " (*Toal v. Tardif* (2009) 178 Cal.App.4th 1208, 1218.) "Arbitration is 'a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration.' [Citation.] Consequently, the first question in any arbitration dispute must be: What have these parties agreed to?" (*Coinbase, Inc. v. Suski* (2024) ___U.S.___ [144 S.Ct. 1186, 1192, 218 L.Ed.2d 615, 621].)

"When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." (*First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944.)

### 2.    Governing Law

Preliminarily, the parties dispute at length which state's law governs the issue of contract formation, with DeLuca urging that Florida law applies while respondents advocate for Utah law pursuant to the cardmember agreement's choice of law provision. (No party urges that California law governs, and the agreement's provision for Utah law tends to dispel any idea that the parties intended for California law to apply. Nor can the agreement's choice of Utah law govern whether the agreement itself exists. But that does not mean Florida law applies by default.) This tempest is largely immaterial because, as discussed below, Utah and Florida law agree in all pertinent respects. (See *Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 580 [no choice of law

8

problem "where the laws of the two states are identical"].)  In any event, we agree with DeLuca that Florida law governs the issue of contract formation.

"Before a . . . court may apply state-law principles to determine the validity of an arbitration agreement, it must determine which state's laws to apply.  It makes this determination using the choice-of-law rules of the forum state, which in this case is California."  (*Pokorny v. Quixtar, Inc.* (9th Cir. 2010) 601 F.3d 987, 994.)

Under California choice-of-law rules, "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."  (Civ. Code, § 1646.)  In a credit agreement, the place of performance is the place where payment is made.  (*Ury v. Jewelers Acceptance Corp.* (1964) 227 Cal.App.2d 11, 16.)

Here, it is undisputed that the cardmember agreement was made in Florida, where DeLuca resides and where American Express sent DeLuca the credit card and cardmember agreement.  It is also undisputed that the agreement was performed in Florida, where DeLuca made payments to American Express.

Therefore, Florida law governs the issue of contract formation.

### 3. Contract Formation Under Florida Law

"To prove the existence of a contract under Florida law, the party seeking to enforce the contract must prove offer, acceptance, consideration, and sufficient specification of essential terms."  (*CEFCO v. Odom* (2019) 278 So.3d 347, 352 (*CEFCO*).)  As stated by the Florida Supreme Court, "It has long been held in Florida that one is bound by his contract.  Unless one can show

9

facts and circumstances to demonstrate that he was prevented from reading the contract, or that he was induced by statements of the other party to refrain from reading the contract, it is binding. No party to a written contract in this state can defend against its enforcement on the sole ground that he signed it without reading it." (*Allied Van Lines, Inc. v. Bratton* (Fla. 1977) 351 So.2d 344, 347–348.) A written "contract may be binding on a party who did not sign it where assent can be shown by that party's acts or performance." (*CEFCO*, at p. 351.)

Here, American Express invited acceptance of the cardmember agreement by performance when it provided that DeLuca's use of its credit card constituted acceptance of the agreement. DeLuca subsequently used the card and made payments. Under Florida law, this constituted acceptance of the cardmember agreement—with its choice-of-law and arbitration provisions—by performance, whether or not DeLuca read it.

### 4. The Parties Entered an Express Contract

DeLuca argues that his agreement to use the American Express card and pay for the charges extended only to that use and those payments, not to the cardmember agreement's choice-of-law or arbitration provisions, for several reasons.

First, DeLuca argues his use of the American Express card and payment of the charges incurred created only an implied contract, the terms of which included no choice-of-law or arbitration provision. He argues "there is no conduct on the part of DeLuca that would evidence an agreement to apply Utah law."

In support of the proposition that he entered into an implied agreement with American Express, DeLuca relies on section 13 of 17A American Jurisprudence, Contracts, which states that (1) "an implied contract is deduced from the

10

circumstances as well as the parties' relations, while [an express contract] is proven by direct evidence of an actual agreement," and (2) "[t]he terms of a contract implied in fact can be inferred from the acts of the parties or the general course of dealing between the parties . . . ." (17A Am.Jur.2d (2024) Contracts, § 13.)

But even under this treatise (and Florida law), DeLuca entered into an express contract, not an implied one. " '[A]n implied contract is one in which some or all of the terms are inferred from the conduct of the parties and the circumstances of the case, though not expressed in words.' " (17A Am.Jur.2d (2004) Contracts, § 12.) " 'An express contract is an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing. [¶] In a contract implied in fact the assent of the parties is derived from other circumstances, including their course of dealing or usage of trade or course of performance." (*Rabon v. Inn of Lake City, Inc.* (Fla.Dist.Ct.App. 1997) 693 So.2d 1126, 1131 (*Rabon*); see also (*McMillan v. Shively* (Fla.Dist.Ct.App. 2009) 23 So.3d 830, 831 [same].)

Here, the terms to which DeLuca admits he agreed—use of an American Express card and payment of the charges made on it—were stated in the cardmember agreement, making it an express agreement.

To create an implied agreement, American Express's assent would have had to have been "derived from other circumstances," including its "course of dealing." (*Rabon, supra*, 693 So.2d at p. 1131.) But DeLuca identifies no circumstance or course of dealing by American Express suggesting it assented to an implied

11

agreement.  That DeLuca assented to the cardmember agreement only by actions rather than words, which the agreement specifically invited, neither transmuted that express agreement into an implied one nor created a separate, implied agreement.

### 5.    Assent by Performance Sufficed

Deluca argues that under Florida law, the rule that a party may not avoid the terms of an agreement on the ground that he failed to read them applies only when that party assents by signing the agreement, not by performing under it.  He derives this supposed exception from the following purportedly logical construct:

Although " '[o]ne who signs a contract is presumed to know its contents' " (*McMichael v. Deutsche Bank Nat'l Tr. Co.* (Fla.Dist.Ct.App. 2018) 241 So.3d 179, 181), "a logical corollary to this rule [DeLuca argues] is that the same presumption would not exist for one who has not signed a contract."

This construct commits the fallacy of the inverse (otherwise known as denying the antecedent): the incorrect assumption that if P implies Q, then not-P implies not-Q.  "But the inverse of a true conditional statement is not necessarily true.  See Ruggero J. Aldisert, *Logic for Lawyers* 163 (3d ed. 1997) (explaining that the logical fallacy known as 'denying the antecedent of a conditional statement' occurs when the statement ' "if P then Q" is taken to imply "if not P, then not Q" '); *see also* Irving M. Copi & Carl Cohen, *Introduction to Logic* 306, 357 (9th ed. 1994) (explaining the same)." (*Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.* (3d Cir. 2024) 108 F.4th 144, 154.)  That one who signs a contract is presumed to know its contents does not imply that one who does *not* sign a contract (but manifests acceptance by performance) is *not* presumed to know its contents.

12

It is true that the Florida cases we have reviewed frequently use the word "signed" when applying the non-avoidance rule to parties who enter a contract (whereas the Restatement applies it simply to parties who "assent" to the contract). But Florida, like every other jurisdiction we have reviewed, permits acceptance by performance. We therefore take Florida courts' use of the word "signed" to be shorthand for "accepted," such that even under Florida law, one who accepts a contract, even if only by performance, is presumed to accept all of its terms.

The Restatement on Contracts, which Florida courts frequently invoke, supports this view. It acknowledges that a party such as American Express that "makes regular use of a standardized form of agreement does not ordinarily expect [its] customers to understand or even to read the standard terms. . . . Customers do not in fact ordinarily understand or even read the standard terms. They trust to the good faith of the party using the form and to the tacit representation that like terms are being accepted regularly by others similarly situated. But they understand that they are assenting to the terms not read or not understood, subject to such limitations as the law may impose." (Restat.2d, Contracts, § 211, com. b; see also *Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 914 [consumers involved in standard form contracts generally do not read the entirety of the contract, including any arbitration clause]; see *Sanchez*, at p. 914 ["fewer than 7 percent of credit card consumers subject to predispute arbitration clauses knew that they could not sue in court"].)

The Restatement goes on to observe, however, that "[a]lthough customers typically adhere to standardized

agreements and are bound by them without even appearing to know the standard terms in detail, they are not bound to unknown terms which are beyond the range of reasonable expectation." (Restat.2d, Contracts, § 211, com. (f).)

Under Florida law, because DeLuca assented to the express cardmember agreement, even if only by his conduct, he assented to all terms within the range of reasonable expectation.

**B.     The Cardmember Agreement Requires Arbitration in This Case**

The above discussion concerning the cardmember agreement's choice of law provision applies equally to its arbitration provision. Thus, even under Florida law, DeLuca agreed to arbitrate his disputes against American Express.

The same holds true under Utah law (which DeLuca does not dispute). (See Utah Code Ann. § 25-5-4(2)(e) [credit agreement enforceable where debtor is provided with written copy of terms, agreement provides that use of credit offered constitutes acceptance of those terms, and debtor requests funds pursuant to agreement]; § 70C-4-102(b) [creditor may change open-end consumer credit contract to include arbitration or other alternative dispute resolution mechanism]; § 70C-4-105 [creditor may contract with debtor of open-end consumer credit contract for class action waiver].)

DeLuca observes that under Florida law "there must be sufficient proof that the parties *actually* agreed to arbitrate." (*CEFCO, supra*, 278 So.3d at p. 351, italics added.) He argues that no Florida case appears to address the issue of what it means to actually agree to arbitrate, which must "mean[] something more than accepting the benefits of the contract in which the arbitration provision appears."

14

We disagree.  As discussed above concerning the cardmember agreement's choice of law provision and applied to its arbitration provision, Florida law holds that assent by performance constitutes actual agreement to reasonably expected terms, including arbitration terms.

DeLuca cites five cases for the proposition that Florida courts have refused to enforce an arbitration provision in an unsigned contract even though the party resisting arbitration received the benefits thereof:  *CEFCO, supra*, 278 So.3d at pp. 351-352 (employment relationship); *Steven Owren, Inc. v. Connolly* (Fla.Dist.Ct.App. 2004) 877 So.2d 918, 920 (independent contractor relationship); *GR OPCO, LLC v. Murillo* (Fla.Dist.Ct.App. 2023) 352 So.3d 1279, 1280 (employment relationship); *Gustavsson v. Wash. Mut. Bank, F.A.* (Fla.Dist.Ct.App. 2003) 850 So.2d 570, 573 (banking relationship); *Palm Garden Healthcare Holdings, LLC v. Haydu* (Fla.Dist.Ct.App. 2017) 209 So.3d 636, 639–640 (nursing home resident).  He invites us to find in these holdings a rule that acceptance of an agreement by performance extends only to the incidents of that performance, and not to terms beyond performance such as choice of law and arbitration provisions.

We decline the invitation, for three reasons.  First, we hold that Utah, not Florida law governs the cardmember agreement. Under Utah law, where a creditor provides a written copy of the credit terms, use of the credit constitutes acceptance of those terms.

Second, DeLuca identifies no pertinent holding in any of the five cases he lists, merely citing them without elaboration. " 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority,

15

we treat the point as waived.' " (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862.)

Third, the issue here is not whether an arbitration provision in an unsigned contract is enforceable as to a party who *received benefits* under the contract, but whether it is enforceable as to a party who *manifested consent* to the contract. For example, in *CEFCO*, the court declined to enforce an arbitration provision as to a party who received benefits under an employment agreement not because she did not sign the agreement but because she adamantly maintained "she was never presented with the Agreement and did not see it until Appellant filed its motion, she never entered into the Agreement or agreed to its terms, and '[i]f anyone purportedly entered into the agreement on [her] behalf, he or she did so without [her] knowledge or consent.' " (*CEFCO, supra,* 278 So.3d at pp. 349–350.) (The employee surmised that an acquaintance completed a job application on her behalf and without her knowledge. (*Id.* at p. 350.)) The court held that the employer failed to meet its burden of proving that the employee personally consented to the terms of the employment agreement. Here, DeLuca is bound by the cardmember agreement's arbitration not because he received benefits under the agreement but because he actually consented to it.

DeLuca observes that in *Badie v. Bank of America* (1998) 67 Cal.App.4th 779 (*Badie*), the court held that an arbitration agreement in a credit account "bill stuffer" was unenforceable. *Badie* is inapposite.

In *Badie*, an account agreement between Bank of America and its credit card customers permitted the bank to unilaterally change the terms of the agreement simply by sending customers

16

an insert with their monthly account statements, notifying them of the new terms. Bank of America sought to add to existing account agreements an alternative dispute resolution (ADR) clause by sending customers an insert with their monthly account statements notifying them of the new ADR requirement. (*Badie*, *supra*, 67 Cal.App.4th at p. 783.) The court observed that modification of a contract may be made "in accordance with the terms of the contract" (*id*. at p. 791), and implicitly accepted that pursuant to its account agreement, Bank of America could modify the agreement by sending notice of the modification with a monthly account statement. However, the court held the ADR provision was unenforceable because its wording was "far from the direct, clear and unambiguous language required to alert a customer that . . . he or she is waiving an important constitutional right." (*Id*. at p. 805.) In other words, *Badie* invalidated an ADR provision not because it came in a bill stuffer the customer failed to read, but because it was vague and ambiguous.

Here, DeLuca does not suggest the arbitration provision in the cardmember agreement is vague or ambiguous.

## C. The Arbitration Was Not Procured by Corruption

An arbitration award must be vacated if it was "procured by corruption," or "[t]here was corruption in any of the arbitrators." (Code Civ. Proc., § 1286.2, subd. (a)(1), (2).)[1]

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

DeLuca contends the arbitration was corrupted because Suarez failed to disclose the names of the attorneys in the December 6 Arbitration.  We disagree.

### 1.    Pertinent Law

"The judicial process is not ordinarily administered by persons chosen by the parties and paid a fee for the service, but by public officials chosen by a process in which the public participates, whose compensation is at levels that are fixed by law and cannot be affected by their rulings." (*Benjamin, Weill & Mazer v. Kors* (2011) 195 Cal.App.4th 40, 66 (*Benjamin*).) "Because judicial officers cannot accept a fee for their services, they have no economic interest in potential customers' response to their decisions.  [¶]  Private arbitration, on the other hand, has become a major commercial enterprise in this jurisdiction. . . . 'Courts have long struggled with the problem of ensuring not only the neutrality but also the perception of neutrality of arbitrators, who wield tremendous power to decide cases and whose actions lack, for the most part, substantive judicial review.' " (*Id.* at pp. 66–67.)

"The widespread use in this state of referees and arbitrators selected and paid by the parties in disputes removed from the judicial system has raised issues that have long been recognized and studied, including the danger that the arbitrator's impartiality might be compromised by economic considerations.  At the time the present version of section 1281.9 was enacted, concern focused on the increasing use by private corporations and industry associations of standard agreements and contract clauses mandating the private arbitration of future disputes . . . ." (*Benjamin, supra*, 195 Cal.App.4th at p. 67.)

The California Arbitration Act sought to "protect the integrity of private arbitration[] by requiring a proposed arbitrator to disclose the prior or pending cases in which he or she served as an arbitrator and the results of the arbitration." (*Benjamin*, *supra*, 195 Cal.App.4th at p. 69.)

To this end, section 1281.9 provides in pertinent part:

"(a) In any arbitration pursuant to an arbitration agreement, when a person is to serve as a neutral arbitrator, the proposed neutral arbitrator shall disclose all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial, including . . . [¶] . . . [¶]

"(4) The names of the parties to all prior or pending noncollective bargaining cases involving any party to the arbitration or lawyer for a party for which the proposed neutral arbitrator served or is serving as neutral arbitrator, and the results of each case arbitrated to conclusion, including the date of the arbitration award, identification of the prevailing party, the names of the parties' attorneys and the amount of monetary damages awarded, if any."[2]

---

[2] The pertinent subdivision of section 1281.9 is (a)(4), which applies when a proposed arbitrator served as a neutral arbitrator in a prior or pending arbitration, not subdivision (a)(3), which applies when the proposed arbitrator served as a *party* arbitrator in another proceeding. Here, although it is undisputed that Suarez was appointed to serve only as a neutral arbitrator in another proceeding, DeLuca has always—until his appellate reply brief—relied on subdivision (a)(3), not (a)(4). Because the two subdivisions are materially identical, we will construe DeLuca's reliance on subdivision (a)(3) as an immaterial error.

19

"[T]he proposed neutral arbitrator" must make this disclosure "within 10 calendar days of service of notice of the proposed nomination or appointment."  (§ 1281.9, subd. (b).)

"A proposed neutral arbitrator shall be disqualified if he or she fails to comply with Section 1281.9 and any party entitled to receive the disclosure serves a notice of disqualification within 15 calendar days after the proposed nominee or appointee fails to comply with Section 1281.9." (§ 1281.91, subd. (a).)

"The right of a party to disqualify a proposed neutral arbitrator pursuant to this section shall be waived if the party fails to serve the notice pursuant to the times set forth in this section . . . .  [I]n no event may a notice of disqualification be given after a hearing of any contested issue of fact relating to the merits of the claim . . . ."  (§ 1281.91, subd. (c).)

"An arbitrator's failure to disclose facts as required by section 1281.9 warrants vacation of his or her award." (*Benjamin, supra*, 195 Cal.App.4th at p. 73.)

In sum, when a person "is to serve" as an arbitrator in the instant proceeding (§ 1281.9, subd. (a)), he or she must disclose the names of the parties in any "prior or pending" proceedings (involving the instant parties) where the person also "served or is serving" as a neutral arbitrator (*id*. at subd. (a)(4)).  The proposed arbitrator must also disclose the results of each case "arbitrated to conclusion," including the names of the parties' attorneys. (§ 1281.9, subd. (a)(4).)  These disclosures must occur within 10 days of the proposed arbitrator's nomination or appointment. (§ 1281.9, subd. (b).)

If the proposed arbitrator fails to make this disclosure, he or she shall be disqualified if a party entitled to the disclosure serves a notice of disqualification within 15 days after the failure

20

to disclose. (§ 1281.91, subd. (a).) This right of disqualification shall be forfeited if the party fails to exert it within these 15 days. (§ 1281.91, subd. (c).) The right lapses after a hearing on any contested issue of fact relating to the merits of the instant claim. (*Ibid*.)

### 2. Application

Here, the record does not reflect when Suarez was appointed as the arbitrator in this case (§ 1281.9, subd. (b)), but it must have happened some time before the hearing (after discovery) on November 16, 2022.

The record does not reflect, and DeLuca does not contend, that when Suarez was appointed, he had "served or [wa]s serving" as a neutral arbitrator in a "prior or pending" arbitration, or that any such matter had been "arbitrated to conclusion." (§ 1281.9, subd. (a)(4).)

(In fact, the record does not reveal whether Suarez *ever* served in another arbitration. Although he indicated on December 6, 2022, three weeks after the arbitration hearing, that he had been "selected to serve as an arbitrator" in the December 6 Arbitration, Frontino, American Express's attorney, declared that Suarez "did not ultimately serve as an arbitrator in the [December 6 Arbitration] and did not have any substantive involvement." It is unclear how Frontino knew this, but DeLuca does not appear to contend on appeal that Suarez actually served in the other arbitration.)

Nor does the record reflect that DeLuca ever moved to disqualify Suarez (§ 1281.91, subd. (a)), much less that he did so before "a hearing of any contested issue of fact relating to the merits" of his own arbitration (§ 1281.91, subd. (c)).

21

Under these circumstances, nothing in the record suggests matters existed that could cause a person to reasonably entertain a doubt that Suarez could be impartial. Specifically, Suarez owed no duty under section 1281.9 to disclose the names of parties in a prior or pending arbitration because when he was appointed to the instant arbitration, there *was* (on this record) no prior or pending arbitration. Even if another arbitration was pending, Suarez owed no duty to disclose the participating attorneys because nothing indicates that arbitration had concluded. And even if Suarez owed duties of disclosure and breached them, DeLuca never moved to disqualify him.

Therefore, the arbitration award was not procured by corruption, and DeLuca's motion to vacate the award on this ground was properly denied.

DeLuca argues that the disclosure requirements set forth in subdivision (a) of section 1281.9 were triggered not when Suarez was appointed to the instant arbitration but when he was selected to participate in the *December 6* Arbitration. We disagree.

Subdivision (b) of section 1281.9 provides that the proposed neutral arbitrator must make certain disclosures "within 10 calendar days of service of notice of the proposed nomination or appointment." (§ 1281.9, subd. (b).) Here, Suarez was appointed to arbitrate the instant action some time in 2002 (certainly more than 10 days before December 6, 2022). The 10 days commenced when he was thus appointed. Nothing in section 1281.9 suggests that disclosure requirements in one arbitration refresh each time a person is nominated to arbitrate subsequent disputes.

Even if the 10-day window commenced on December 6, 2022, that fact would not assist Suarez because he failed to move

22

to disqualify Suarez within 15 days of expiration of those 10 days. (§ 1281.91, subd. (c).) (DeLuca argues section 1281.91 applies only to disqualification of a *proposed* neutral arbitrator, whereas Suarez was not a proposed arbitrator but the *actual* arbitrator. But under this logic, Suarez would owe no duty of disclosure under section 1281.9 at all, as that section applies only "proposed" neutral arbitrators, a term it uses eight times.)

Even if Suarez was obligated to disclose matters about the December 6 Arbitration, he would not be obligated to disclose the names of the attorneys there—the only disclosure DeLuca seeks—because that arbitration had not proceeded to conclusion. Subdivision (a)(4) of section 1281.9 obligates a proposed arbitrator to disclose only the names of the parties to prior or pending arbitrations "and the results of each case arbitrated to conclusion, including . . . the names of the parties' attorneys . . . ." Nothing in subdivision (a)(4) obligates a proposed arbitrator to disclose the names of attorneys in a pending, i.e., unfinished arbitration.

We conclude the instant arbitration award was untainted by any failure to disclose the names of attorneys in the December 6 Arbitration.

## II.    APPEAL AS TO GEARYS

DeLuca contends that even if he entered into an arbitration agreement with American Express, Gearys could not compel arbitration because it was not a signatory to the cardmember agreement and because DeLuca's claims against Gearys are independent of his obligations under that agreement. Gearys contends it was entitled to enforce the agreement under the doctrine of equitable estoppel.

23

### A. Governing Law

"Because arbitration is a matter of contract, the basic rule is that one must be a party to an arbitration agreement to be bound by it or invoke it—with limited exceptions." (*Soltero*, *supra*, 102 Cal.App.5th at pp. 892–893.)

One exception is the doctrine of equitable estoppel, which precludes a party from asserting rights it otherwise would have had against another when its own conduct renders assertion of those rights inequitable. (*Goldman v. KPMG, LLP* (2009) 173 Cal.App.4th 209, 220 (*Goldman*).) In the arbitration context, "if a plaintiff relies on the terms of an agreement to assert his or her claims against a nonsignatory defendant, the plaintiff may be equitably estopped from repudiating the arbitration clause of that very agreement. In other words, a signatory to an agreement with an arbitration clause cannot . . . 'on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory.' " (*Ibid.*)

"[T]he *sine qua non* for application of equitable estoppel as the basis for allowing a nonsignatory to enforce an arbitration clause is that the claims the plaintiff asserts against the nonsignatory must be dependent upon, or founded in and inextricably intertwined with, the underlying contractual obligations of the agreement containing the arbitration clause." (*Goldman*, *supra*, 173 Cal.App.4th at pp. 217–218; see also *Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 20 ["The doctrine focuses on the 'nature of the claims asserted by the plaintiff against the nonsignatory defendant.' [Citation.] 'Claims that rely upon, make reference to, or are intertwined with claims under the

subject contract are arbitrable' "].) "This requirement comports with, and indeed derives from, the very purposes of the doctrine: to prevent a party from using the terms or obligations of an agreement as the basis for his claims against a nonsignatory, while at the same time refusing to arbitrate with the nonsignatory under another clause of that same agreement." (*Goldman*, at p. 221.)

Equitable estoppel does not apply merely because the complaint "makes reference to . . . an agreement containing an arbitration clause . . . ." (*Goldman*, *supra*, 173 Cal.App.4th at p. 218.) "[E]quitable estoppel is 'inapplicable where a plaintiff's allegations reveal no claim of any violation of any duty, obligation, term or condition' imposed by the contract." (*Namisnak v. Uber Technologies, Inc.* (9th Cir. 2020) 971 F.3d 1088, 1095.)

### B.    Application

Applying these principles, we conclude the trial court incorrectly compelled arbitration as to Gearys based on the doctrine of equitable estoppel.

DeLuca sued Gearys for its filing a police report with no reasonable cause to believe DeLuca knowingly used a stolen credit card to purchase an expensive watch.

" 'The common law tort of malicious prosecution originated as a remedy for an individual who had been subjected to a maliciously instituted criminal charge . . . .' [Citation.] The tort consists of three elements. The underlying action must have been: (i) initiated or maintained by, or at the direction of, the defendant, and pursued to a legal termination in favor of the malicious prosecution plaintiff; (ii) initiated or maintained without probable cause; and (iii) initiated or maintained with

25

malice." (*Parrish v. Latham & Watkins* (2017) 3 Cal.5th 767, 775.)

No element of DeLuca's malicious prosecution claim against Gearys depends upon or is founded in and inextricably intertwined with the obligations of the cardmember agreement. Therefore, DeLuca does not seek "to hold the non-signatory liable pursuant to duties imposed by the agreement." (*Goldman, supra*, 173 Cal.App.4th at p. 220.)

Gearys argues that *but for* the cardmember agreement, DeLuca would have no claim against the jeweler because he would not have had an American Express with which to purchase the Rolex. This may be true. But it is not "sufficient that . . . the controversy would not have occurred but for the existence of the contract, provided the contract is not the basis for the claims against the non-signatory." (*Mattson Technology, Inc. v. Applied Materials, Inc.* (2023) 96 Cal.App.5th 1149, 1156; see also *DMS Servs., LLC v. Superior Court* (2012) 205 Cal.App.4th 1346, 1356–1357 [the concept of "claims founded in and intertwined with the agreement containing the arbitration clause" is not to be confused "with but-for causation"]; *In re Pacific Fertility Cases* (2022) 85 Cal.App.5th 887, 896 ["the analysis is not a simple 'but for' test, but whether plaintiffs' claims demonstrate ' "actual reliance on the terms of the agreement to impose liability" ' "].)

The lack of interconnectedness between the cardmember agreement and the substance of DeLuca's claims against Gearys makes it equitable for DeLuca to avoid arbitration. "[T]he ' " 'fundamental point' " ' of using equitable estoppel to compel arbitration is to prevent a party from taking advantage of a contract's substantive terms while avoiding those terms requiring arbitration." (*Ford Motor Warranty Cases, supra,* 89 Cal.App.5th

26

at p. 1336.) Here, DeLuca's claims against Gearys are all founded on elements independent of the substantive terms of the cardmember agreement, which defined only what financial services American Express would provide and what obligations DeLuca would owe. Because DeLuca is not trying to embrace those substantive terms in support of his claims against Gearys, he is not compelled to embrace the cardmember agreement's arbitration provision as to Gearys.

The trial court therefore erred in compelling DeLuca to arbitrate his claims against Gearys.

## DISPOSITION

The orders compelling arbitration and confirming the arbitration award are affirmed as to American Express but reversed as to Gearys. American Express is to receive its costs on appeal. DeLuca is to receive costs as to his appeal against Gearys, if any.

NOT TO BE PUBLISHED



KLINE, J.[*]

We concur:


ROTHSCHILD, P. J.          WEINGART, J.

---

[*] Retired Justice of the Court of Appeal, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27